**Yasuo SASAKI, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Oct. 6, 1972.

William H. Allison, Jr., Louisville, Robert Allen Sedler, Lexington, Ellen Mosen James, Louisville, for appellant.

John B. Breckinridge, Atty. Gen., M. Curran Clem, Asst. Atty. Gen., Frankfort, Frank Benton, III, Commonwealth Atty., Newport, for appellee.

Robert C. Cetrulo, Covington, Robert F. Greene, Burlington, for amicus curiae of Northern Kentucky Right to Life Committee.

GARDNER, Commissioner.

Dr. Yasuo Sasaki was convicted of the crime of using an instrument with intent to procure the miscarriage of a pregnant woman, a violation of KRS 436.020(1), and his punishment was fixed at $1,000 fine and one year and nine months in the reformatory. We affirm.

Kathleen Iatrides, a divorcee with two children, upon belief that she was pregnant

consulted Dr. Sasaki, who confirmed her thoughts of pregnancy. As testified to by Mrs. Iatrides, Dr. Sasaki agreed to and did perform an abortion for a fee of $300. While Dr. Sasaki denied performing the abortion, he does not now raise the question of sufficiency of evidence to submit the case to the jury. His contentions are that the court erred in the selection of the jury and that the convicting statute is unconstitutional.

KRS 436.020 provides:

"(1) Any person who prescribes or administers to any pregnant woman or to any woman whom he has reason to believe pregnant, at any time during the period of gestation, any drug, medicine or other substance, or uses any instrument or other means, with the intent to procure the miscarriage of that woman, unless the miscarriage is necessary to preserve her life, shall be fined not less than five hundred dollars nor more than one thousand dollars, and confined in the penitentiary for not less than one nor more than ten years.

"(2) If, by reason of any of the acts described in subsection (1) of this section, the miscarriage of the woman is procured and she does miscarry, causing the death of the unborn child, whether before or after quickening time, the person violating the provisions of subsection (1) of this section shall be confined in the penitentiary for not less than two nor more than twenty-one years.

"(3) In any prosecution under subsection (1) or (2) of this section, or under KRS 435.040, the consent of the woman to the performance of the operation or the administering of the drug, medicine or other substance shall be no defense, and she shall be a competent witness in the prosecution. For the purpose of testifying she shall not be considered an accomplice."

The voir dire examination was rather lengthy and meticulous. Appellant persist-

ently asked individual members of the jury panel if they were Catholics and because of that had such religious scruples against abortions that they might be prejudiced against appellant simply because he was being tried for an offense involving an abortion. Four of the panel stated categorically that they were against abortions. As one put it, "I don't believe in abortions, period." They were excused for cause. Two members offered the comment that, if appellant hadn't performed the abortion he wouldn't be on trial. They were excused for cause. Appellant of course does not complain of error regarding the members of the panel who were excused but he insists the judge was in error in refusing to let him interrogate the remaining jurors, and that if he had been permitted to cross-examine them it might have developed that they, like others who were excused, were so prejudiced against any person being tried on an abortion charge they could not be unbiased jurors.

After eleven jurors were selected and appellant had used all peremptory challenges except one, the court summoned the attorneys to chambers but the record does not disclose what transpired. Upon return to open court the following colloquy took place:

"MR. ALLISON: Your Honor, I want to get that of record, that you are taking away the voir dire.

BY THE COURT: Certainly. Let the record show that the Court has relieved counsel of all voir dire examination. The Court will conduct it. Draw a juror."

The court then conducted the voir dire as follows:

"BY THE COURT: Mrs. Crow, you have heard all of the questions that have been propounded by the Court and the counsel?

MRS. CROW: Yes.

BY THE COURT: Do you have any bias or prejudice against the performance of an abortion, if there were one?

MRS. CROW: No.

BY THE COURT: And you will decide the case based on the evidence that is presented to you today?

MRS. CROW: Yes, sir.

BY THE COURT: And the law that the Court gives you?

MRS. CROW: Yes, sir.

BY THE COURT: You want to exercise a peremptory?

MR. ALLISON: Yes, I do, Your Honor.

BY THE COURT: You're excused. Draw another juror."

Appellant insists that he was denied the right of examining jurors as guaranteed by RCr 9.38:

"Examination of Jurors. The court may permit the attorney for the Commonwealth and the defendant or his attorney to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the attorney for the Commonwealth and the defendant or his attorney to supplement the examination by such further inquiry as it deems proper. The court may itself submit to the prospective jurors such additional question submitted by the parties or their attorneys as it deems proper."

▆▆▆ The court is of the opinion that appellant did not properly preserve the error, if there was one. Whether the result of the in-chambers conference was that appellant agreed to the court's handling the voir dire or whether appellant objected is not disclosed by the record. If there was an unfavorable ruling made in chambers, it was incumbent upon appellant to see to it that the proceedings were made a part of the record. We are of the opinion that appellant did not make known to the court the action which he desired the court to take nor his objection to the action of the court as required by RCr 9.22. In Blanton v. Commonwealth, Ky., 429 S.W.2d 407 (1968), where the defendant contended that the trial court's comments concerning parole prevented him from having a fair trial, we held that the error was not properly preserved for appellate review where the only objection to the comments was, "Show my objection to the remarks regarding parole."

It is also noted that the court's conduct of the voir dire, though somewhat abbreviated, continued to cover essentially the same line of questioning used by appellant with prior jurors. Without any objection from appellant, it might well be assumed that the court's questioning was satisfactory to appellant.

Appellant vigorously insists that KRS 436.020 is unconstitutional. The same arguments advanced here regarding the unconstitutionality of this statute were addressed to the federal court wherein a three-panel district court held the statute was constitutional. See opinion written by Judge Mac Swinford, 344 F.Supp. 587, filed in the Eastern District of Kentucky, May 19, 1972. We find Judge Swinford's opinion so well written and dispositive of the issues raised here that we adopt the opinion as our own and copy it almost in full as follows:

"The plaintiffs make two primary constitutional attacks: (1) it is contended that the statute is too vague, and (2) it is argued that the statute is too broad in that it infringes upon certain fundamental rights of the plaintiffs. Additional constitutional arguments are made, however, it is the court's opinion that the arguments, to be discussed later, are not substantial.

"Kentucky Revised Statute 436.020 reads as follows: [The statute quoted is copied in full earlier in the opinion and will not be repeated here.]

"Plaintiff Crossen, a duly licensed and practicing obstetrician and gynecologist, alleges that the statute is unconstitutionally vague for the reason that it renders him criminally liable for performing a medical operation in terms too uncertain to inform him of the proscribed conduct. More precisely it is argued that the phrase 'necessary to preserve her life' does not describe what the probability of a woman's death must be in order to legalize the performance of an abortion. Several examples are given where a pregnancy carried to term could result in a probable reduction of a woman's normal life span, but which would not result in her immediate demise. In other words, Dr. Crossen argues that there are relatively common medical situations where the woman is in no danger of imminent death, but where an abortion would help to assure the fulfillment of her normal life expectancy by preventing the exacerbation of existing health problems. Crossen contends that it is impossible, under the wording of the statute, to determine whether an abortion may be performed to save a woman from a future but untimely death, or whether such an operation may be performed within the strictures of the law only if it is necessary to save the woman from certain and imminent death. Put simply, is the phrase 'necessary to preserve her life' unconstitutionally nebulous?

"The accepted test in determining the required precision of statutory language imposing criminal liability is whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Anderson v. United States, 215 P.2d 84 (6 Cir. 1954); and Roberts v. United States, 226 F.2d 464 (6 Cir. 1955). This test is qualified to the extent that it is understood that the due process clause of the Constitution does not require impracticable or impossible standards of specificity. United States v. Carter, 311 F.2d 934 (6 Cir. 1963).

"The court is of the opinion that the phrase 'necessary to preserve her life' is not unconstitutionally vague, albeit perhaps technically imprecise. The phrase means, and is generally understood to mean, that an abortion is unavailable except if it is reasonably certain that a woman's continued pregnancy will result in her death. The argument of vagueness is, in our judgment, nothing more than a guise for the plaintiff's belief that the statute too rigidly regulates what, under certain conditions, can be a safe and salutary surgical procedure. We agree with the observation of the court in Steinberg v. Brown, 321 F. Supp. 741 (D.C.1970), which in speaking of the alleged vagueness of an Ohio abortion statute, similar to that here under attack, stated: 'The problem of the plaintiffs is not that they do not understand (the statute), but that basically they do not accept, its proscription.'

"This brings us to the next issue of the controversy: Does the statute, because of its restrictiveness, infringe upon fundamental constitutional rights of women?

"Plaintiff Craddock argues that the statute denies a woman her constitutional right to decide in privacy whether to abort an unquickened fetus. Craddock contends that the Ninth Amendment guarantees certain personal rights, one of which is the fundamental right to privacy. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, the Supreme Court acknowledged the right to privacy in matters of marriage, family and sex. This right, the Court held, encompassed the right of a woman or a married couple to decide whether or not to employ contraceptive devices. The plaintiff argues that if a woman has the right to prevent conception, she must have the concomitant right to nullify conception when contraception fails. All of this is to assert that there exists a constitutional right to decide to have an abortion. This right, the alleged constitutional right to abortion, is, it is argued, denied by Kentucky Revised Statute 436.020. If

there is a constitutional right to abortion, that is a right to determine whether to submit one's self to an abortion, then, Kentucky's statute could only be justified if a compelling need could be therefor shown. See Bates v. Little Rock, 361 U.S. 516 at 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1959).

■ "We do not take issue with the wisdom of the Supreme Court's decision in Griswold v. Connecticut. Surely there exists a right to privacy in certain matters of marriage, family and sex which the Constitution secures inviolate. But this right is not absolute. If there be a compelling reason, it can be regulated or limited.

■ "It is our opinion that the State has a compelling reason for an interest in the existence of the current abortion statute.[1]

"1. See the dissent of Judge Garth in YWCA of Princeton, New Jersey v. Kugler, 342 F.Supp. 1048 (D.C.N.J.1972: three judge court), where he stated:
 'It is with respect to the latter half of the equation (the nature and extent of the state interest necessary to justify an invasion of this fundamental right, ✱ ✱ that I part company with the majority.
 ✱ ✱ ✱ ✱ ✱
 'I hold that the state has such a compelling interest in the preservation of life, including fetal life, that even the fundamental right which I have acknowledged must be subordinated to that state interest.
 'It must be remembered that the fundamental right with which we are here concerned can only be exercised by destroying potential life.
 ✱ ✱ ✱ ✱ ✱
 'I do not imply that fetal life is equivalent in every sense to "human life." I maintain only that the state's interest in preserving fetal life outweighs the interest of the mother and the family unit.'

✱ ✱ ✱ ✱ ✱ ✱

"Although it is clear that the State has a compelling interest in the preservation of potential human life, the existence of that interest could, as several courts have suggested, be better balanced with a woman's interest in and right to privacy. But this would be a matter for the legislature. The determinative point which must be recog-

nized is that a compelling interest does exist under which a statute of this rigidity must be held to be constitutional. The court's only responsibility in this case is to decide the constitutionality of the statute. It is not the job of the court to deliberate upon the quality of the statute. We feel that the statute could and should be reformed to more fairly recognize the interest of the pregnant woman, but matters of mollification and reform are subjective matters which must be left up to the legislative branch of the government. See Judge Campbell's dissent in Doe v. Scott, 321 F.Supp. 1385 (D.C.1971).

"The following quotation from Circuit Judge Craven's opinion from the three judge court in Corkey v. Edwards, 322 F. Supp. 1248 (D.C.1971), is a significant statement of fundamental law. It should serve as a reminder to the federal judiciary of the obligation to exercise judicial restraint in nullifying the will and desires expressed by a duly enacted statute of long standing on a matter of deep significance to the way of life, attitude of mind and individual personal faith of the whole people of a sovereign state.

'Persuasive, therefore, as the host of statistics, facts and opinions plaintiffs urge upon us appear to be, and as commendable as the efforts plaintiffs have shown in their attempt to right what is considered by many a social wrong are, we must decline what we consider to be an invitation to decide what is best for North Carolina. The legislature is the proper arena for the resolution of "fundamentally differing views." '

"In addition to the plaintiffs' two primary attacks upon the statute they argue that it (1) represents an unconstitutional establishment of religion; (2) is in violation of the Fourteenth Amendment's equal protection of the law clause, and that it (3) is violative of the Fourteenth Amendment's due process clause. These arguments, although well presented, are largely without merit.

■ "It is asserted that the sole justification for abortion statutes is that there is something human to protect. However, it is suggested that the determination of what is human—that is when the embryo or fetus becomes human—is in essence a theological question not to be resolved by the State. For the State to assume that the embryo is human is, it is claimed, tantamount to an unconstitutional establishment of religion.

"This argument is simply not of constitutional proportions. It may be that the precise determination of when the embryo or fetus becomes a human life in being, is, as the court in YWCA v. Kugler, supra, recognized, a question beyond judicial competence, however, we believe that no such determination is essential for a constitutional justification of the statute. The State is certainly competent to recognize that the embryo or fetus is potential human life, and it is the State's compelling interest in potential human life that justifies the statute.

■ "It has been argued here and in other cases that abortion statutes contravene the Fourteenth Amendment right to equal protection of the law in that such statutes, in actuality, only preclude poor women from obtaining legal abortions. The plaintiffs point out that a woman with sufficient money, unlike a poor woman, is always free to travel outside of the State and procure a legal abortion. The court need not be told that a rich woman has greater economic freedom than a poor woman, but this is not in and of itself a fact which would vitiate the statute on constitutional grounds. The plaintiffs here, as in other cases, have only asserted that there is a constitutional right to *decide* to have an abortion. We know of no case where it has been successfully argued that there is an absolute constitutional right to abortion. The fact that a woman may have a constitutional right to privately decide whether to submit to an abortion does not mean that she has a constitutional right to require the State to perform the abortion. Simply, and perhaps somewhat callously put, a poor woman may not be able to afford an abortion even though the State might guarantee her the right to decide to have one. The plaintiffs' argument is admittedly poignant, but we cannot say that it merits a constitutional invalidation of the statute. See Steinberg v. Brown, supra, where the court noted that the problems caused by the disparity between certain women's economic status was not caused by the wording of the statute.

■ "Finally the plaintiffs have argued that the Kentucky abortion statute denies, without due process, a woman's right to protect her health. It is suggested that it is unconstitutional to deny anybody medical treatment that is necessary for the preservation of that person's health. The same legal tenets are applicable here as were applicable to the plaintiffs' contention that the statute invaded the constitutional right of privacy. A State may only regulate constitutional rights if it has a compelling reason to do so. A woman may have a constitutional right not to have her health impaired without due process, but this right may be limited if the State has a compelling interest in limiting it. In regard to this argument, we think the State's interest in potential life justifies the statute.

■ "It can be admitted that any pregnancy may result in some deterioration of a woman's health. The simple living of life results in a deterioration of health, but it is a natural deterioration against which no one has an assertable constitutional right. Similarly the strain which pregnancy puts upon a woman is a natural strain; a strain which in the nature of things is not proscribed by the Constitution. It is only where the woman's life is in certain and imminent danger that the State may not deny her the right to decide to have an abortion. The Kentucky statute does not deny that right.

"It is, perhaps, significant to mention that there has been wide disagreement be-

tween the federal courts which have had to consider the constitutionality of state abortion statutes. The three judge panels deliberating upon these statutes, which have been for the most part functionally identical, have failed to achieve any degree of uniformity of opinion. In Steinberg v. Brown, 321 F.Supp. 741 (D.C.1970); Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (D.C.1970); and Corkey v. Edwards, supra; state abortion statutes were held constitutional. In Roe v. Wade, 314 F.Supp. 1217 (D.C. 1970); Babbitz v. McCann, 310 F.Supp. 293 (D.C.1970); Doe v. Scott, 321 F.Supp. 1385 (D.C.1971); Doe v. Bolton, 319 F. Supp. 1048 (D.C.1970); and YWCA v. Kugler, 342 F.Supp. 1048 (D.C.1972); state abortion statutes were held unconstitutional. Most of these decisions were accompanied by strong dissents; in fact it appears that in the above listed cases there have been fifteen judges of the opinion that abortion statutes are unconstitutional while nine judges have been of the belief that abortion statutes are constitutional.

 "It is an axiom of the judiciary that there exists a presumption in favor of the constitutionality of a duly enacted statute. The courts, in deference to legislative bodies, which must be presumed to have acted within the scope of their powers, will not strike down a statute unless its violation of the Constitution is clear, complete and unequivocal. The statute whenever possible should be construed to be constitutional. U. S. v. Vuitch, 402 U.S. 62, 91 S. Ct. 1294, 28 L.Ed.2d 601. This statute's violation, if any, of the Constitution is not clear, complete and unequivocal. By the stronger reason, its constitutionality, and the presumption in favor of its constitutionality, is supported by more than a half of a century of unchallenged existence and application.

"Moreover it would be improper, in the case of Kentucky, to assert that the statute is archaic and hopelessly outdated; to imply that the lack of legislative reform is not responsive to the will of the people. During this past session of the Kentucky General Assembly less rigid abortion measures were introduced and considered, however, none were adopted. As corroborated by reliable polls, a large majority of the people of Kentucky are in favor of rigid abortion laws, and support of the current statute under which they must live. We believe that Kentucky's abortion statute represents a legitimate exercise of its legislative authority, and that there is nothing in the Constitution of the United States which compels its nullification."

We too hold the statute constitutional.

The judgment is affirmed.

All concur.